UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SANJEAN DOWRICH,                          :
                                          :
                        Plaintiff,        :        **OPINION & ORDER**
                                          :        03-CV-2392 (DLI)(VVP)
            -against-                     :
                                          :
ARAMARK HEALTHCARE SUPPORT                :
SERVICES, INC.,                           :
                                          :
                        Defendant.        :
-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff, Sanjean Dowrich ("Dowrich"), brings this action against defendant, Aramark

Healthcare Support Services, Inc. ("Aramark") alleging gender and race discrimination stemming

from Aramark's failure to promote her, denial of a promised salary increase and termination of her

employment. Dowrich also alleges retaliation in the form of an audit that led to her termination, all

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and in violation of 42 U.S.C.

§1981. Defendant now moves for summary judgment under Fed. R. Civ. P. 56 (c). For the reasons

set forth below, defendant's summary judgment motion is granted.

**Facts**

Plaintiff, who is both African-American and female, started working for Aramark in 1997

as a reserve manager at North General Hospital in Manhattan ("North General").[1] (Counter

Statement ¶ 1). In March 1999, Dowrich became the operations manager of environmental services

at North General. (Counter Statement ¶ 4). At the time, Aramark provided both food services and

---

[1]       All facts are taken from defendant's Statement of Undisputed Facts Pursuant to Local
Civil Rule 56.1 ("D. 56.1 Statement") and plaintiff's Answer and Counter Statement to
Defendant's Rule 56.1 Statement ("Pl. Counter Statement") unless otherwise noted.

environmental services to North General, which included housekeeping, laundry and linen distribution services. (D. 56.1 Statement ¶¶ 3, 5). As the operations manager of environmental services, Dowrich reported to Mercedes Redwood ("Redwood"). (Counter Statement ¶ 6). Redwood was Aramark's general manager for North General, a position which gave her responsibility for both the Environmental Division and the Food Services Division. (D. 56.1 Statement ¶ 5). Dowrich received much of her training from Redwood in an informal matter. (Counter Statement ¶ 9).

### The January 2000 Audit

In January 2000, Aramark conducted a "surprise" housekeeping audit of Dorwich, which Dorwich passed. (Counter Statement ¶ 10). The audit was marred by a comment made by Maurice Hundevadt, one of the auditors, that Dorwich "turned stupid since [she] got around Mercedes." Dorwich believed that Hundevadt's comment had racial connotations. (Counter Statement ¶ 12). Dorwich filed a complaint with Aramark's human resources department. (Counter Statement ¶ 13). In response to the complaint, in February 2003, David Marks, one of Aramark's district managers, visited North General and told Dorwich that "she should never have gone to human resources." (Counter Statement ¶ 14). Later that day, Marks had another confrontation with Dorwich where he jabbed his fingers into her ribs. (Counter Statement ¶ 15). Dorwich reported the incident with Marks to other Aramark supervisors and continued to press her case against Hundevadt. (Counter Statement ¶ 16). Hundevadt was counseled by his supervisor, Michael Ronchi, but neither he nor Marks was disciplined for the incident. (Affirmation of Peter G. Eikenberry ("Eikenberry Aff.), Exhibit 13 ). Undeterred, Dorwich pressed her complaint with Ray Walsh, the president of Aramark. (Counter Statement ¶ 17). Walsh was sufficiently concerned about the incident to order David

Berkowitz, Aramark's regional vice president for the Northeast Region, to investigate. (Counter Statement ¶ 21). At a later meeting, Berkowitz told Dorwich and Redwood that Marks admitted touching Dorwich but did not mean to hurt her. (Counter Statement ¶ 23). Berkowitz also cautioned Dorwich not to go over his head and lodge complaints with Walsh, but rather to come directly to him. *Id.*

According to Dowrich, a second related incident occurred in October 2001 when, at a "management development review meeting" in Tarrytown, New York, Raymond Cottrell, an associate district manager for the Northeast Region, publicly stated that any criticism of himself or Berkowitz would lead to termination. (Counter Statement ¶ 139). Dowrich believed that Cottrell's comment was aimed squarely at her because of her complaint to Walsh and her persistent inquiries about a promised salary increase that never materialized. (discussed below). (Counter Statement ¶ 140-141).

<u>Aramark's Contract with North General and Dorwich's Promotion and Salary Increase</u>

Aramark's environmental services contract with North General provided that Aramark received a fixed annual service fee. (D. 56.1 Statement ¶ 6). From this service fee, Aramark budgeted its expenses. *Id.* Besides the service fee, the only expense that North General was responsible for was personnel services. *Id.* The personnel services fees were subject to a "paid hours guarantee" so that it would not exceed a set annual amount. *Id.* Manager's salaries – including Dorwich's – were not paid for by North General, but rather were paid out of the fixed annual service fee that Aramark received. (D. 56.1 Statement ¶ 7).

Aramark's fiscal year runs from October 1st through September 30th, although budgetary projections are made during the summer months in preparation for the next fiscal year. (D. 56.1

Statement ¶ 47). In the Spring of 2001, North General informed Aramark that, beginning in August 2001, Aramark would no longer be responsible for food services, but only environmental services. (D. 56.1 Statement ¶ 9). Redwood, who as overall director of North General was responsible for assembling the following year's budget, drafted "a proposed budget of the new structure." (Deposition of Mercedes Redwood annexed to Eikenberry Aff. as Exhibit 24 ("Redwood Dep."), 22). The proposed budget for 2002 assumed that, in the new structure, Dowrich would be promoted to director of environmental services. Accordingly, the 2002 budget included an increased salary for Dowrich. (Redwood Dep. 22-24). Based on the fact that Cottrell approved the budget, as well as Redwood's representation that Dorwich "would be director after she leaves," Dorwich claims she, in fact, was promoted in June 2001. (Counter Statement ¶¶ 60-61). Cottrell and Redwood deny that they approved a salary increase or a promotion in June of 2001. (Declaration of Raymond Cottrell in Support of Defendant's Motion for Summary Judgment ("Cottrell Decl.") ¶ 20; Declaration of Mercedes Redwood in Support of Defendant's Motion for Summary Judgment ("Redwood Decl.") ¶ 15-17). The $469,284 service fee for 2002, including Dowrich's proposed $65,220 salary, was approved by Berkowitz and was incorporated into the 2002 "Managed Services Agreement" between Aramark and North General. (Counter Statement ¶¶ 82-84).

        Although Dowrich was referred to as the "ENV SRV DIRECT" (effective June 2001) on a November 2001 employee profile, on a January 2002 employee profile, and in her termination letter, Dowrich never received the pay increase she was promised. (Counter Statement ¶¶ 89-97; Eikenberry Aff., Exhibits 4,5). In January 2002, Dowrich inquired about the status of the pay increase with the new district manager and her direct supervisor, Jeffrey Thomas. (Counter Statement ¶¶ 102-103). Thomas' response was that he would discuss the issue with Berkowitz.

(Counter Statement ¶ 104). The salary increase was not forthcoming, however, and, when Dowrich next saw Berkowitz, Berkowitz told her that he would schedule a meeting to discuss her compensation. (Counter Statement ¶105). Dowrich made three phone calls after April 2002 to inquire about the meeting, but Berkowitz failed to schedule the meeting or resolve Dowrich's compensation issue. (Counter Statement ¶¶ 106-108).

During this time, Thomas left Aramark and was replaced as district manager by George Hasaka. (Counter Statement ¶ 110). As the new district manager, Hasaka scheduled a meeting with Dowrich on May 22, 2002. (Counter Statement ¶¶ 111). Dowrich took the opportunity to press her compensation issue and those of Monique Kelly and Jeff Howell, two other African-American employees who also had been promised salary increases that never materialized. (Counter Statement ¶¶ 112-114). Dowrich also sent an e-mail message to Karen Flood, the human resources director, again asking why the salary increase had not been forthcoming, especially since North General was paying Aramark an increased annual service fee to cover the additional expenses. (Counter Statement ¶ 116).

Hasaka investigated why Dowrich and others had not received salary increases. Hasaka e-mailed Tom Neuhs and Michael Ronchi, two other district managers and called Berkowitz. (Counter Statement ¶¶ 117, 119-120). Berkowitz responded that if there was to be a pay increase, it should not be retroactive to August, 2001. Neuhs forwarded the e-mail to Cottrell for guidance. (Counter Statement ¶¶ 118, 121). Cottrell responded that he thought there should have been an increase, and that it was overdue, but that Hasaka should speak with him to find out more. (Counter Statement ¶ 122). After speaking with Cottrell, Hasaka explained to Dowrich that she did not receive a pay increase because her duties did not change as environmental services director from the duties she had

as operations manager. However, Hasaka asked Dowrich to write a memo delineating the differences between the two jobs. (Counter Statement ¶ 123).

In a memo dated June 24, 2002, from Dowrich to Hasaka, Dowrich explained the differences between her duties as environmental services director and operations manager but also explained that (1) she felt slighted by the fact that Berkowitz promised to meet with her but did not; (2) she knew that "promotional increases are effective at the time the employee begins the new position;" (3) Aramark's management was not "fair and impartial when dealing with other people's livelihood;" and (4) she continues "to fight for equitable treatment in this organization, which to some, comes as their birthright, while others continue to struggle." (Declaration of Robert R. Reed ("Reed Decl."), Exhibit 9; Counter Statement ¶¶ 126-128). According to Dowrich, the June 24, 2002, memorandum was meant to assert that African-Americans and women at Aramark are not treated the same as their white male colleagues. (Counter Statement ¶ 129).

Hasaka received the June 24, 2002, memo and forwarded it to Karen Flood. (Counter Statement ¶ 163). Hasaka also had a conversation with Berkowitz regarding the memorandum and Hasaka recommended that Dowrich receive the salary increase– although not as large an increase as Dowrich expected. (Counter Statement ¶ 164). However, Dowrich never received the increase because, on July 2, 2002, Dowrich was subject to a surprise audit, the results of which led to her termination (see below).

Petty Cash Procedures

Aramark's petty cash policy allows designated management employees to disburse amounts below $50.00 for non-recurring purchases. (D. 56.1 Statement ¶ 16). Disbursements from petty cash require that the recipient and/or the person disbursing the petty cash (1) obtain a receipt from the

supplier of the service; (2) prepare a petty cash voucher; and (3) attach the receipt to the petty cash voucher. (Cottrell Decl., Exhibit C). The petty cash fund should be balanced weekly, with every disbursement correlating to every expenditure (documented by a receipt and voucher). *Id.* At North General, the petty cash fund was established in Dowrich's name, so that she would be reimbersed directly for all petty cash fund expenditures – expenditures which presumably were properly documented. Redwood Decl. ¶ 24; (D. 56.1 Statement ¶¶ 55-56). Travel expenses and entertainment expenses are not eligible to be paid through the petty cash fund, but rather through a wholly separate reimbursement system.[2] (D. 56.1 Statement ¶ 17). The policy also forbids managers who have authority over petty cash expenditures to reimburse their own expenses from the petty cash fund. (D. 56.1 Statement ¶ 18).

<u>The July 2002 Audit</u>

On or around June 13, 2002, Annie Moxam, an Aramark employee who reported to Dowrich, became embroiled in a dispute with Dowrich regarding paid overtime. (D. 56.1 Statement ¶ 71). Moxam contacted Berkowitz and alleged that Dowrich was violating Aramark's petty cash handling procedures. (D. 56.1 Statement ¶ 73). On or about June 27, 2002, after Berkowitz obtained more information from Moxam, Berkowitz authorized a surprise audit of Dowrich.[3] On July 3, 2002,

---

[2]      Dowrich disputes that this was Aramark's petty cash policy and denies the portions of Defendant's 56.1 Statement which outline the policy. (Counter Statement ¶ 24). However, Dorwich does not provide any alternative policy or explain any reason why this was not the policy. This is insufficient to create a genuine issue of material fact because a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

[3]      Dowrich denies having any knowledge or information regarding whether Moxam contacted Berkowitz to report the alleged improprieties. (Counter Statement ¶ 1). Dowrich, however, denies that Berkowitz met with Moxam to discuss the allegations, and also denies that

Cottrell and John Delahunt, the regional finance director, initiated a surprise audit of North General's cash handling procedures. (Counter Statement ¶¶ 168-169). The audit was conducted by Cottrell and Delahunt in Dowrich's office, without Dowrich present. (Counter Statement ¶ 175). Cottrell asked Dowrich about several petty cash receipts, asked Dowrich for the balance of the petty cash, and took all the original documents without leaving a copy for Dowrich. (Counter Statement ¶¶ 182-183). The audit continued on July 8, 2002.[4] (Counter Statement ¶ 186; D. 56.1 Statement ¶ 86). On that day, Delahunt and Cottrell met with Dowrich and asked questions about Dowrich's handling of petty cash. After a brief investigation, Dowrich was told that she was suspended pending further investigation. (Counter Statement ¶¶ 187-188). Dowrich claims that there were numerous improprieties in the way the audit was conduced and that the procedures used were created specifically to facilitate the surprise audit and, by extension, to find wrongdoing on her part. (Counter Statement ¶¶ 225-253).

After the audit, Cottrell and Delahunt reviewed Aramark's financial records in an attempt to reconcile them with the records maintained by Dowrich and found that there were five checks issued to Dowrich for which there was no supporting documentation. Moreover, only one out of

---

Moxam prepared an "agenda to be used at the meeting which stated the allegations, among other things." (Counter Statement ¶ 24). At her deposition, under oath, Moxam attested to the meeting, to preparing an agenda and to speaking with Berkowitz about it. Deposition of Annie Moxam ("Moxam Dep."), annexed as Exhibit 4 to the Reed Decl. 22-23, 27. As noted below, Dowrich's denial that the meeting took place, and that Moxam provided an agenda to Berkowitz does not create a genuine issue of material fact because it is unsupported by any admissible evidence and it is clearly contradicted by the record.

[4] Dowrich was not scheduled to work on July 5, 2002 and was not in the office. (Counter Statement ¶ 184). Aramark claims that Cottrell was also not scheduled to work and did not continue conducting the audit on July 5, 2002. However, Dowrich denies that Cottrell was out that day, and implies that he was nefariously conducting the audit at North Central on July 5. (Counter Statement ¶ 24, 185).

twenty-four checks issued to Dowrich was supported by (1) a completed petty cash disbursement request form; (2) properly completed petty cash vouchers and (3) receipts from the vendor indicating where the purchases were made. Aramark's petty cash handling policy requires that every disbursement be documented in that fashion.[5] (D. 56.1 Statement ¶¶ 87-88, 89-92). Most of the expenditures were unsupported by properly completed petty cash vouchers (demonstrating who received the funds and who approved of the distribution). Moreover, for some period of time, there were no signed vouchers (although there are numerous receipts), and there were no reconciliation reports for all of 2002. (Cottrell Decl. ¶¶ 70-71). Many of the receipts were for expenses such as meals, cab rides and hotel stays that were not eligible for petty cash disbursement, but should have been paid for by a reimbursement of the employee who made the expenditure. (Cottrell Decl. ¶ 70-71). Dowrich, for her part, denies having any knowledge or information as to whether or not the petty cash expenditures were properly documented, that the petty cash expenditures were excessive, and that petty cash was used for ineligible expenses. (Counter Statement ¶ 24). However, Dowrich states that she was unfamiliar with the proper procedures because she was never trained (Counter Statement ¶¶ 144-150). She asserts that it was actually Cottrell's responsibility to train her on proper

---

[5]     Dowrich, for her part, denies that she embezzled any funds and asserts that the five checks for which there is no documentation were never cashed by her, and implies that they may not have ever been issued. (Counter Statement ¶¶ 195-201). Aramark claims that the checks were issued and cashed and provides invoice details for all five checks (showing that they were issued) and also provides a computerized document purporting to show that the checks were cashed. (Exhibit L to the Cottrell Decl.; Exhibit T to Cottrell's Supplemental Declaration in Further Support of the Motion ("Cottrell Sup. Decl.")). Aramark has not produced the canceled checks which would, presumably, demonstrate that the checks were both issued to and cashed by Dowrich. Because Dowrich denies it, there are issues of fact with respect to whether Dowrich actually embezzled funds. However, these issues of fact are immaterial to the outcome of the motion in light of the substantial evidence that Dowrich violated petty cash procedures, as explained below.

petty cash handling procedures (Counter Statement ¶ 217) and offers the blanket denial that she ever mishandled any petty cash. (Counter Statement ¶ 221). The audit also revealed certain discrepancies in Dowrich's handling of paid overtime and vacation records, which Dowrich denies. (Counter Statement ¶¶ 210-211; D. 56.1 Statement ¶¶ 107).

After a consultation with Berkowitz, Moxam, the auditors, and Hasaka, among others, Kimberly A. Smith, the regional human resources director for Aramark's northeast region, decided to terminate Dowrich, effective July 19, 2002. On August 8, 2002, Aramark informed both Dowrich and Kelly that they were terminated. (D. 56.1 Statement ¶ 140). The stated reason for the termination was that Dowrich violated Aramark's cash handling procedures. (D. 56.1 Statement ¶¶ 113-117). On August 9, 2002, Dowrich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC declined to take action, but issued a right to sue letter on February 17, 2003. (D. 56.1 Statement ¶138). The complaint was timely filed on May 13, 2003.[6]

---

[6]"Under Title VII . . . a New York plaintiff must file an administrative claim with the EEOC within 300 days of the discriminatory conduct." *Tropeano v. City of New York*, No. 06-CV-2218, 2006 U.S. Dist. LEXIS 86013 (E.D.N.Y. Oct. 31, 2006); *see* 42 U.S.C. § 2000e-5(e) ("[I]in a case of an unlawful employment practice . . . such charge will be filed . . . within three hundred days after the alleged unlawful employment practice occurred."); *see also McPherson v. New York City Dep't of Ed.*, 457 F.3d 211, 213 (2d Cir. 2006). The Supreme Court has recently explained that "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place." *Ledbetter v. Goodyear Tire & Rubber Co.*, Inc.,127 S.Ct. 2162, 2169 (2007). Dowrich's termination claim and retaliation claim occurred within 300 days of the EEOC charge. It is unclear to the court when, exactly, Dowrich's denial of the promotion occurred since the parties do not agree on whether Dowrich was ever actually promoted. Since this issue was not briefed by the parties, the court will assume (but not decide) that Dowrich was finally denied the promotion within the 300-day charging period.

**Discussion**

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. Moreover, even where there appears to be a genuine issue of material fact, the Supreme Court has instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007).

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1998); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 989, 998 (2d Cir. 1989). However, the Second Circuit has maintained that summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Airlines Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The function of the court on a motion for summary judgment in an employment discrimination case "is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 204 (2d Cir. 1995) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). The inference of a discriminatory motive must be supported by something more than mere conjecture since "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

    II.    Dowrich's Failure to Promote and Wrongful Termination Claims

    Dowrich claims, in essence, that Aramark impermissibly discriminated against her based on her race when Aramark denied (or delayed) giving her a salary increase, a promotion, and then terminated her. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl. Memo") 19. Under the burden shifting rules set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff has the initial burden of making out a prima facie case of discrimination. *See id.* at 802, 93 S.Ct. 1817. A prima facie case may be established by showing (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action. The fourth and most important prong is that "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in [a protected] class." *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).

The court finds that Dowrich has satisfied the first three prongs of the framework. However, Dowrich's attempt to satisfy the fourth, and most important one, fails. No reasonable jury could find that Dowrich was actually promoted and promised a salary increase even though Dowrich claims she was. Dowrich denies Aramark's claim that "the process by which Aramark evaluates its employees and determines promotions and increases takes place in the period of [sic] October through December of each year . . . [a]ny change in a manager's title, grade or salary has to be approved by two levels of management above that manager, as well as the regional human resources director." (Counter Statement ¶ 5). Even viewing all the evidence in the light most favorable to Dowrich, the court finds that a rational jury could not conclude that Dowrich was promoted because Aramark has submitted overwhelming evidence that promotions and salary increases require multiple levels of approval and do not occur automatically. *See* Redwood Decl. ¶¶18-19; Cottrell Decl. ¶¶16-17; Declaration of Kimberly Smith in Support of Defendant's Motion for Summary Judgment ("Smith Decl.") ¶13; Declaration of J. Bruce Grisi in Support of Defendant's Motion for Summary Judgment ("Grisi Decl.") ¶¶ 2-3, 6. Dowrich cannot create a genuine issue of material fact through her unsupported conclusory allegation that Aramark follows a different procedure and she was promoted through that different process. *Scott v. Harris*, 127 S.Ct. at 1776 (2007); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.").

Second, although Aramark budgeted and received an increased service fee from North General to cover the cost of Dowrich's promised pay raise, the parties disagree over the significance of the amount of the increase. "Upon information and belief" Dorwich claims that, when Aramark charges a client an increased service fee to cover increased labor costs for management employees,

the money always goes to pay increased salaries, rather than to increase Aramark's bottom line. (Counter Statement ¶ 87). Aramark asserts that, regardless of the amount of the serivce fee, it retained total discretion over Management salaries. (D. 56.1 Statement ¶ 47). It is improper for the court to consider Dowrich's assertion because it is not based on personal knowledge. *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 26 (2d Cir.1988) (finding that assertion made " 'upon information and belief' . . . could not have been considered in the summary judgment motion"). Therefore, no reasonable jury would conclude that the increased service fee meant that Dowrich was, in fact, promised a salary increase.

Dowrich contends that her African-American supervisor promoted her and her promotion was properly approved. However, a white supervisor (Berkowitz) then denied the promotion and pay increase. Aramark later terminated her. Even assuming that Dowrich was promoted and promised the pay increase, viewing all the evidence in the light most favorable to Dowrich, her claim must fail because, as explained below, there is simply no evidence that would allow a reasonable jury to infer that Berkowitz's denial of the promotion and salary increase and Aramark's decision to terminate Dowrich were even partially motivated by Dowrich's race.

Recognizing that employers will often disguise discriminatory intent with a pretextual, non-discriminatory explanation for an adverse employment action, courts have developed a burden shifting analysis to test an employer's proffered legitimate reason for a termination. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998). Under this analysis, the plaintiff carries the initial burden of proving a prima facie case of discrimination. *McDonnell Douglas v. Green*, 411 U.S. at 802. The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse employment action. The defendant's burden at this stage is merely one of production, not

persuasion.  See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).  Once the defendant meets the burden of producing a legitimate reason for the adverse employment action, "[t]he presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Id.* at 509.  The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination.  *See Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

Applying the framework, Aramark's legitimate, non-discriminatory reason for terminating Dowrich was her alleged violation of Aramark's petty cash handling procedures.  The burden now shifts to Dowrich to demonstrate that Aramark's proffered reason is pretextual.  However, Dowrich has not shown that similarly situated employees in a non-protected class were not subject to termination for violating petty cash handling procedures, which is one typical way of demonstrating pretext.  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (inference of discrimination arises when individual of one race treated less favorably than those of another race who are similarly situated); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997) (woman may prove inference of discrimination by showing similarly situated man treated differently); *Sundaram v. Brookhaven Nat. Laboratories*, 424 F. Supp. 2d 545, 577 (E.D.N.Y. 2006) ("[o]ften, in termination cases, the plaintiff establishes such an inference by producing evidence that the plaintiff. . .was replaced by someone outside his protected class.").  Dowrich has failed to make this showing.[7]

---

[7]     Dorwich was replaced, on an interim basis, by Norman Howell, an African American male.  (D. 56.1 Statement ¶ 119).  Richard Emanuel, a West Indian or Caribbean black male took

-15-

Of course, "while such a showing of disparate treatment is probably the most common way to create an inference of discrimination, it is not the only method." *Abdu Brisson v. Delta Airlines Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). In *Abu Brisson,* the plaintiffs were unable to show disparate treatment by comparing themselves with similarly situated employees outside the protected class because there were no similarly situated employees to compare themselves to. This is simply not the case here: Aramark is large company and plaintiff may not have had to look very far to find a similarly situated employee in a non-protected class who was not disciplined (or terminated) despite violating Aramark policies.

Nor are there other indicia of discriminatory intent on Aramark's part, such as, for example "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id* at 468. The closest Dowrich can come to demonstrating discriminatory intent is to assert that the sequence of events leading up to her termination creates an inference of discrimination. On this point, Dowrich has the burden of demonstrating discrimination because, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Moreover, the court must determine whether "there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient

Dowrich's position on a permanent basis. *Id.*

evidence to support an inference of discrimination." *James v. New York Racing Assoc.*, 233 F.3d 149, 157 (2d Cir. 2000). Thus, the court must be convinced that the surprise audit that Dowrich claims was not conducted in conformity with Aramark policy was a pretext for discrimination.

The court, however, is not convinced because Dowrich's attempt to overcome Aramark's legitimate reasons is based on pure conjecture. Based on her race, and the race of Berkowitz, Dowrich surmises that the denial of the promotion, the denial of the salary increase and the audit were based on race. (Pl. Memo 19). Other than Dowrich's assumption, there is no evidence that race played any role. An assumption devoid of evidence to support it is conclusory. The Second Circuit cautioned that "to allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985).

Dowrich's evidence of pretext are far from sufficient. Maurice Hundevadt's January 2000 comment that Dorwich "turned stupid since [she] got around Mercedes," a comment which Dorwich believed had racial connotations, does not convince the court that Aramark's legitimate reasons for Dowrich's termination were pretextual. (Counter Statement ¶ 12). As a general rule, isolated and disconnected derogatory remarks by a decision maker are by themselves insufficient to raise an inference of discrimination. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998); *Hayes v. Compass Group USA, Inc.*, 00 CV 09733, 2004 WL 2471640, at *7 (D. Conn. Oct.8, 2004). To create an inference of discrimination, the remarks must either be accompanied by additional evidence of discrimination, or the plaintiff must demonstrate a nexus between the remarks and the adverse employment action that was suffered. *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y.2004). In deciding whether this nexus is established, a court should consider whether the

person who made the remarks had some connection to the employment decision, when the remarks were made in relation to the employment decision, and the context and content of the remarks. *Hansberry v. Father Flanagan's Boys' Home,* 03 CV 3006, 2004 WL 3152393, *5 (E.D.N.Y. November 28, 2004). Hundevadt's comment to Dowrich was made a year and a half before Dowrich was promised the promotion and salary increase and two and one half years before the surprise audit that lead to her termination. Moreover, the comment was made by an employee who had nothing to do with the eventual denial of the promotion, denial of the salary increase, audit and termination. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 224-25 (2d Cir. 2005) (holding that plaintiff could not "base a claim of sexual orientation discrimination on [coworkers'] alleged comments" without evidence that supervisor consulted coworkers regarding termination decision).

Dowrich next argues that the audit was pretextual because she, as an African-American female, was the lowest paid of all Aramark's envionmental service directors. (Counter Statement ¶¶ 131-132). However, Dowrich's evidence that other, non African-American Environmental service directors, were paid more is inadmissible hearsay from a former Aramark employee. Inadmissible hearsay cannot be used to oppose Aramark's motion. *The Banana Connection, Inc. v. M/V Maersk San Juan*, 04 CV 9203, 2006 WL 1379104 *4 (S.D.N.Y. May 17, 2006); *Boxill v. Brooklyn College*, 96 CV 561, 2003 WL 21554498 *2 (E.D.N.Y. July 10, 2003). Even if Dowrich's evidence were not hearsay, its probative value is highly doubtful because the Second Circuit has repeatedly held that statistical evidence purporting to show the effects of discrimination is not probative of an employer's intent where no effort is made to account for other possible causes of the disparity. *See, e.g.*, *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir.1999). Moreover, when the sample size is small (as it is in this case), courts are cautioned to be very skeptical. *Pollis v. The*

*New School for Social Research*, 132 F.3d 115, 121-22 (2d Cir. 1997) (collecting decisions in which "courts have ruled, as a matter of law, that discrimination may not be proved by statistics involving [a] small ... pool," such as 10 to 15).

Finally, Dowrich cannot show that Aramark's proffered reason is a pretext for impermissible discrimination because a "demotion for inappropriate behavior disallowed under company policy is clearly a legitimate, nondiscriminatory business reason." *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 461 (S.D.N.Y 2006); *see also Lumpkin v. H.E.L.P. USA*, 02 CV 5475, 2005 WL 839669, at *6 (E.D.N.Y. Jan. 7, 2005) (finding that the defendant articulated legitimate nondiscriminatory reason for demotion of the plaintiff in part based on evidence that the plaintiff's management style created conflicts with other employees); *Moree v. Frank H. Reis, Inc.*, 00 CV 4632, 2001 WL 736810, at *6 (S.D.N.Y. June 25, 2001) (finding plaintiff's violation of company confidentiality policy sufficient to support defendant's showing of legitimate nondiscriminatory reason for demotion). As further explained below, there is no genuine issue of material fact regarding whether Dowrich violated Aramark's cash handling process– she did. The court thus concludes that there is no evidence that race played a role in Aramark's failure to promote and provide Dowrich a salary increase, or in performing an audit and Aramark's decision finally to terminate her.

III.    Dowrich's Retaliation Claim

Title VII prohibits employers from discriminating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter . . . ."  42 U.S.C. § 2000e -3(a).  As with Dowrich's claim of wrongful discharge and failure to promote, to determine whether summary judgment is

appropriate in a Title VII retaliation claim, the court applies the three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, *supra.* Thus, if a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action. *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 178 (2d Cir. 2005).

In order to survive a motion for summary judgment, the employee's burden of proof at the prima facie stage is de minimus. *See Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001). However, the employee must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). The admissible evidence must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546 (E.D.N.Y. 2003) (*citing Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)). A causal connection may be established by showing that the retaliatory action occurred close in time to the protected activity. *Id.* at 547.

Dowrich claims that Aramark retaliated against her by ordering a surprise audit only nine days after receiving a letter where Dowrich complained that she was denied a promotion and a raise

due to her race. (Pl. Memo 14). The timing of the audit is certainly suspicious, and it is an issue for the jury to determine whether or not Dowrich's letter constituted a protected activity and whether Aramark was aware of the activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). However, the court finds that Dowrich cannot make out a prima-facie case of retaliation (and therefore the burden shifting is unnecessary) because ordering the audit was not an adverse employment action.

The Second Circuit has defined an "adverse employment action" to mean a "materially adverse change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted); *See also Pimentel v. City of New York*, No. 00 CV 326, 2002 WL 977535, at *4 (S.D.N.Y., May 14, 2002)("[d]enial of 'requested transfers [that] did not involve an upgrade in position or increases in wages' is not an adverse employment action") *(quoting Gonzalez v. Federal Express Co.,* 95 CV 3529, 1998 WL 289722, at *4 (S.D.N.Y. June 3, 1998)). For instance, termination of employment, demotion evidenced by a decrease in a wage or salary, material loss of benefits and significantly diminished material responsibilities would constitute materially adverse changes. *Id.*

However, numerous courts have found that subjecting an employee to an audit is *not* an adverse employment action for the purposes of Title VII. *See Twisdale v. Snow*, 325 F.3d 950, 954 (7th Cir. 2003) ("[a]udits of programs he administered . . .did not represent tangible or materially adverse employment actions.); *Trahant v. Royal Indem. Co.*, 121 F.3d 1094, 1098 (7th Cir. 1997) ("[t]he audit itself was not an "adverse action" that would support Trahant's theory of retaliation");

*Kruger v. Principi*, 420 F. Supp. 2d 896, 917 (N.D. Ill. 2006)("ordering an audit is not an adverse employment action."); *McLeod v. United Parcel Service, Inc.,* CV. A. SA02CA870-XR, 2003 WL 22251163 *(*W.D.Tex. September 13, 2003*)* ("being audited is not an adverse employment action"); *Price v. Delaware Dept. of Correction*, 40 F. Supp. 2d 544, 552 (D. Del 1999) ("audit on Plaintiff's files while he was out sick.. . .did not affect the compensation, terms and conditions of Plaintiff's employment" and therefore was not retaliatory).

These rulings are consistent with the generally accepted understanding that an adverse employment action must be something more than an every day work occurrence.  For example, the Second Circuit recently held that placement on administrative leave, with pay, during an investigation does not constitute an adverse employment action*. Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006).  The court in *Joseph* reasoned that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its pre-existing disciplinary policies in a reasonable manner." *Id.*  Similarly, a transfer only becomes an adverse employment action when it is " accompanied by a negative change in the terms and conditions of employment." *Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir. 1999).  The transfer itself, like the audit, without more, is not an adverse employment action because, in and of itself, it did not cause Dowrich to suffer a decrease in pay or material loss in benefits, nor were her job responsibilities altered in any way.  The audit revealed violations of Aramark's petty cash handling policies and led to her termination.  It does not make sense as a matter of law or logic to transform an innocuous audit into an actionable adverse employment action simply because it revealed violations of Aramark's cash handling procedure.  Such a holding would have the practical effect

of insulating Dowrich from her own wrongdoing based only on her membership in a protected class, something this court is loath to do.

Assuming *arguendo* that plaintiff has established a prima facie case of retaliation, the burden then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the employment decision.[8]  *See McDonnell Douglas,* 411 U.S. at 802.  To meet this burden, the defendant need only articulate, but not prove, the existence of a nondiscriminatory reason.  See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at  254-56 (1981).  The court finds that the defendant has articulated a legitimate nondiscriminatory reason for the audit: that Berkowitz received information from Moxam about violations of Aramark's petty cash handling procedure.

The audit revealed that Dowrich was at the very least ignorant of Aramark's petty cash handling policy, and, at the very most, flagrantly violating the policy.  Without denying that the policies were violated, Dowrich justified her failure to follow Aramark's petty cash handling procedure by asserting that (1) Redwood dealt with petty cash in a very informal way and she followed Redwood's lead (Counter Statement ¶¶ 26-28, 32); (2) Redwood allowed petty cash to be used for impermissible purposes (cab rides, lunches, employee rewards and staff parties) (Counter Statement ¶¶ 28-30); (3) Redwood delegated petty cash responsibilities to her assistant, Monique Kelly, and Dowrich continued to do so (Counter Statement ¶ 34, 46); (4) Dowrich was not trained on proper petty cash procedures or the business expense policy (Counter Statement ¶¶ 45, 56, 57);

---

[8]      Because the court found that Dowrich failed to state a prima facie case of retaliation, the court need not reach the issue of whether the temporal proximity between the letter and the audit creates causation or whether Dowrich engaged in protective activity that was known to Aramark. This section assumes that Dowrich is able to meet those elements of her retaliation claim without finding that she actually did.

and Dowrich had no idea how to obtain additional petty cash vouchers, so she simply decided not to use them (Counter Statement ¶¶ 52, 53). Despite being ignorant of Aramark's policy, Dowrich nevertheless asserts that she "maintained petty cash documents and receipts for all the petty cash disbursements she made." (Counter Statement ¶ 202).

Assuming the truth of Dowrich's account, as the court is required to do, Aramark has a legitimate non-discriminatory reason to terminate Dowrich since it appears that Dowrich was taking it upon herself to administer a substantial sum of money without understanding the proper procedures for doing so, or taking steps to determine what they were. *See Jimenez v. Big M, Inc.*, 86 F. Supp. 2d 236, 244 (S.D.N.Y. 2000) (defendant presented a legitimate, nondiscriminatory reason for plaintiff's termination, namely, incompetence when store manager failed to follow cash handling and loss prevention policies); *Gorley v. Metro-North Commuter R.R.*, 99 CV 3240, 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000) ("[g]iven the low threshold that defendant must meet, there can be no doubt that misappropriation of funds [sic] is a permissible and sufficient reason for plaintiff's discharge."); *Fierro v. Saks Fifth Avenue,* 13 F. Supp. 2d 481, 489 (S.D.N.Y. 1998) (summary judgment dismissal of Title VII claim appropriate because plaintiff failed to show that discharge for theft of $9.85 by forging a signature was pretext for discrimination). Moreover, in this case, the audit revealed some serious improprieties, including a lack of documentation for numerous disbursements and numerous disbursements for ineligible expenses. (D. 56.1 Statement ¶¶ 89-105).[9]

---

[9] Dowrich denies the allegations in 90, 91, 94, part of 95, 97, 101, 102, 104 and 105 of Defendant's Rule 56.1 Statement, but it is unclear on what grounds. The court is satisfied that no rational jury would conclude that Aramark acted impermissibly by terminating Dowrich based on her shoddy handling of North General's petty cash, even if there are some issues of material fact with respect to whether Dowrich actually embezzled petty cash funds.

Under the burden shifting analysis, once Aramark has demonstrated there was a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to Dowrich to show that the articulated reasons are merely a pretext for discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). In the summary judgment context, the Second Circuit has held that "[t]he ultimate question is whether the employer intentionally discriminated, . . . '[i]t is not enough . . . to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination.'" *James v. New York Racing Assoc.*, 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 147).

Dowrich attempts to show pretext by weaving a complicated narrative linking her memo of June 21, 2004 to the audit. Dowrich alleges that after receiving her June 21, 2002, memo to Hasaka, Berkowitz contacted Moxam and concocted Moxam's allegations of petty cash handing violations in order to have Cottrell and Delahunt conduct the audit that revealed the petty cash handling violations that ultimately lead to Dowrich's termination. (Pl. Memo 15). The record paints a different picture. Moxam swore that she met with Berkowitz to discuss her allegations two or three weeks before June 27, 2002. Moxam Dep. 87. Moreover, in light of Dowrich's admited ignorance of proper petty cash handling procedures, Cottrell and Delahunt did not have to look far to find violations of the policy. Dowrich contends that the audit was conducted improperly. She asserts that Aramark modified its audit protocol the day before it began the audit. Additionally, Dowrich claims that Aramark should not have conducted a surprise audit, particularly without her being present and should have worked with her to achieve compliance instead of terminating her. (Counter Statement ¶¶ 168-187, 226-250). However, any insinuation that Aramark violated its audit procedures – or

somehow altered the results of the audit to create wrongdoing where none otherwise existed – is mere conjecture, and cannot be used to create an issue of material fact for a jury.[10]  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("The nonmoving party cannot defeat summary judgment . . . by a factual argument based on conjecture or surmise.") (internal quotation marks omitted). Dowrich's strongest evidence (and the only evidence that is not pure conjecture) that Aramark's proffered reason is simply a pretext for retaliation is the temporal proximity between her June 21, 2004, letter and the audit.  However, temporal proximity, without more, does not demonstrate that a defendant's proffered reason is merely a pretext.  *Quinn v. Green Tree Credit Corp.*, 159 F.3d at 770 (holding that a strong temporal connection between the plaintiff's complaint *and other circumstantial evidence* is sufficient to raise an issue with respect to pretext) (emphasis added); *Goodwin v. Orange & Rockland Utilities, Inc.,* 04 CV. 0207, 2005 WL 2647929 *11 (S.D.N.Y. October 14, 2005).

In sum, Dowrich's allegations of discriminatory intent is implausible, and, aside from the fact that she is in a protected class and her supervisors are not, Dowrich has not presented even a modicum of evidence that would permit a rational jury to find that the audit was a pretext for discrimination.

---

[10]  Although it is not the court's role to weigh the evidence on a summary judgment motion, Aramark has submitted affdavits from James Broker, the northeast regional finance director and Cottrell attesting to the fact that there was nothing improper about the July 2002 audit.  *See* Supplemental Declaration of Raymond Cottrell in Support of Defendant's Motion and Supplemental Declaration of James F. Brooker Support of Defendant's Motion.

**Conclusion**

For the reasons set forth above, defendant's motion for summary judgment is granted. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED: Brooklyn, New York
September 4, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge